**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**TIMOTHY A. VAIL**,

                                        Plaintiff,

        - v -                                                Civ. No. 9:12-CV-1245
                                                                    (GTS/RFT)
**AMBER LASHWAY**, *Nurse Practitioner, Clinton*
*Correctional Facility*, **VONDA JOHNSON**, *M.D.,*
*Facility Health Services Director, Clinton Correctional*
*Facility*, **DR. MARCO BERARD**, *M.D., Surgeon,*
*Alice Hyde Medical Center*,

                                        Defendants.


**APPEARANCES:**                                **OF COUNSEL:**


**TIMOTHY A. VAIL**
Plaintiff, *Pro Se*
#89-C-1513
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, NY 12589


**HON. ERIC T. SCHNEIDERMAN**                **BRIAN J. O'DONNELL, ESQ.**
Attorney General of the State of New York    Assistant Attorney General
Attorney for Defendants
The Capital
Albany, NY 12224


**RANDOLPH F. TREECE**
**United States Magistrate Judge**

### <u>REPORT-RECOMMENDATION and ORDER</u>

        *Pro se* Plaintiff Timothy Vail brings this Complaint, pursuant to 42 U.S.C. § 1983, alleging

that Defendants failed to provide him with constitutionally adequate medical care and retaliated

against him for exercising his First Amendment right to file grievances. *See generally* Dkt. No. 1,

Compl. Defendants now move, pursuant to Fed. R. Civ. P. 56, for summary judgment. Dkt. No. 37, Defs.' Summ. J. Mot. Plaintiff opposes the Motion. Dkt. No. 43. For the reasons that follow, we recommend that the Defendants' Motion be **GRANTED**.

## I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [FED. R. CIV. P. 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary

judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## II. DISCUSSION

### A. Background

Except where noted, the following facts are undisputed.

On July 6, 2003, while attempting to escape from Elmira Correctional Facility, Plaintiff fell thirty to forty feet off of an exterior wall, causing him to injure, *inter alia*, his left shoulder. Dkt. No. 37-1, Defs.' Statement of Material Facts Pursuant to Local Rule 7.1(a)(3) (hereinafter "Defs.'

7.1 Statement"), at Ex. 1, Elmira Escape R., dated Mar. 19, 2004; Compl. at ¶¶ 1 & 2.[1] Subsequently, while he was incarcerated at Clinton Correctional Facility ("CCF") where nurse practitioner Defendant Amber Lashway acted as Plaintiff's primary care provider ("PCP") from June of 2005 through May of 2010. Dkt. No. 37-5, Amber Lashway Decl., dated Dec. 19, 2013, at ¶¶ 3 & 6.

On December 15, 2006, in response to Plaintiff's complaints about shoulder pain, Defendant Berard, an orthopedic surgeon at Alice Hyde Medical Center ("AHMC"), ordered an x-ray, MRI, and other diagnostic tests. Dkt. No. 39, Portions of Pl.'s AHMC Med. R., at p. 000026; Dkt. No. 37-7, Marco R. Berard Decl., dated Dec. 23, 2013, at ¶¶ 2 & 5–6. On May 18, 2007, after reviewing the results of Plaintiff's diagnostic tests, Defendant Berard concluded that Plaintiff had a "partial thickness tear of the supraspinatus tendon." Defendant Berard recommended that Plaintiff receive physical therapy ("PT") for his left shoulder three times a week for two months. Berard Decl. at ¶ 7; AHMC Med. R. at p. 000028.

On May 22, 2007, Defendant Lashway prescribed Motrin for Plaintiff. On May 24, Plaintiff reported that he was unable to take the Motrin because it hurt his stomach, and Defendant Lashway prescribed Celebrex. On July 10, at Plaintiff's request, Defendant Lashway discontinued Plaintiff's Celebrex prescription and prescribed Tylenol. On August 9, Defendant Lashway prescribed Ultram, in crushed form, for treatment of Plaintiff's shoulder pain. Lashway Decl. at ¶¶ 9–12; Dkt. No. 38,

---

[1] Plaintiff's Complaint is comprised of a *pro forma* § 1983 complaint and a handwritten section, both of which contain numbered paragraphs. When referencing the handwritten portion of Plaintiff's Complaint we refer to the paragraphs as numbered by Plaintiff; when referring to the *pro forma* portion of Plaintiff's Complaint we refer to the page numbers automatically assigned by the Court's Case Management Electronic Case Filing system.

Portions of Pl.'s CCF Med. R., at pp. 7–9.[2]  On September 14, Defendant Berard recommended that

Plaintiff undergo surgery on his left shoulder, and Plaintiff consented.  Berard Decl. at ¶ 10; AHMC

Med. R. at pp. 000029–30; Compl. at ¶ 13.  In his report, Defendant Berard noted that Plaintiff's

pain was a "6 to 7 out of 10" and that he was suffering from "daily pain."  AHMC Med. R. at p.

000029.  "Thereafter, Plaintiff . . . participated in a number of ongoing sessions of physical therapy

. . . until . . . October 31, 2008."  Compl. at ¶ 15.

On September 20, 2007, Plaintiff was accused of hoarding a dose of Ultram.  Nonetheless,

on November 5, Defendant Lashway renewed Plaintiff's Ultram prescription.  Lashway Decl. at ¶¶

14–15; CCF Med. R. at pp. 5–6.  On December 20, Defendant Berard performed surgery on

Plaintiff's left shoulder; in his discharge directions, Dr. Berard recommended that Plaintiff receive

Tylenol #3[3] every four hours as needed for pain.  Berard Decl. at ¶ 12; AHMC Med. R. at pp.

000031–35.  On January 30, 2008, Defendant Lashway renewed Plaintiff's Ultram prescription.

Lashway Decl. at ¶ 19; CCF Med. R. at p. 3.

On August 14, 2008, Plaintiff complained to a nurse about right knee pain; it was noted that

he was already taking Ultram.  On August 22, Plaintiff's prescription for acetaminophen (the generic

for Tylenol) was renewed to be taken every six hours as needed.  On September 23, Plaintiff's

prescription for Ultram was renewed.  Lashway Decl. at ¶¶ 20– 22; CCF Med. R. at pp. 92–94.

On October 2, 2008, Defendant Lashway requested a consultation with an orthopedic

surgeon in response to Plaintiff's complaints of pain in his left shoulder.  Lashway Decl. at ¶ 23;

---

[2] Plaintiff's CCF Medical Record is comprised of documents from multiple non-sequentially numbered sources.  Accordingly, we refer to the page numbers automatically assigned by the Court's Case Management Electronic Case Filing system.

[3] Tylenol #3 is a narcotic pain reliever which contains codeine, an opioid.

CCF Med. R. at p. 91. On January 30, 2009, Defendant Berard recommended surgery after examining Plaintiff's left shoulder and Plaintiff consented. Berard Decl. at ¶ 13; AHMC Med. R. at pp. 000035–38. Defendant Berard performed the surgery on March 10, 2009; in his discharge instructions Defendant Berard recommended that Plaintiff be given Tylenol #3 every four hours as needed for pain. Berard Decl. at ¶ 14; AHMC Med. R. at pp. 000039–41. On March 11, Defendant Doctor Johnson, the Facility Health Services Director at CCF, examined Plaintiff and prescribed Ultram during the two weeks following the surgery. Dkt. No. 37-6, Vonda Johnson Decl., dated Dec. 18, 2013, at ¶¶ 2 & 8; CCF Med. R. at p. 89.

On March 3, 2009, an MRI of Plaintiff's right knee revealed a medial meniscus tear. Lashway Decl. at ¶ 24; CCF Med. R. at p. 90.

On April 10, 2009, Plaintiff was seen by Defendant Berard's colleague Dr. Macelaru,[4] who initially recommended that Plaintiff undergo a third surgery; however, Plaintiff was weary of more surgery and elected PT instead. Compl. at ¶ 17. Dr. Macelaru recommended that Plaintiff "start/continue physical therapy for shoulder instability and to follow up in two months for possible additional therapy if there was no improvement." Berard Decl. at ¶ 15; CCF Med. R. at p. 62. On April 7, Defendant Lashway renewed Plaintiff's Ultram prescription for thirty days. Lashway Decl. at ¶ 28; CCF Med. R. at p. 88. On April 14, Defendant Lashway submitted a request for PT for Plaintiff's left shoulder due to instability and pain. Lashway Decl. at ¶ 29; CCF Med. R. at pp. 62 & 64. On April 30, Plaintiff saw the physical therapist who recommended PT twice a week for six weeks. Lashway Decl. at ¶ 31; CCF Med. R. at p. 62; Compl. at ¶ 19.

On May 5, 2009, Plaintiff was caught hoarding a dose of Ultram. Compl. at ¶¶ 20–22;

---

[4] Dr. Macelaru is not a Defendant in this action.

*-6-*

Lashway Decl. at ¶ 32; CCF Med. R. at p. 87.  On May 7, Defendant Lashway ordered that

Plaintiff's Ultram prescription be discontinued.  Lashway Decl. at ¶ 32; CCF Med. R. at p. 87.

Plaintiff received his last dose of Ultram on the evening of May 7.  Compl. at ¶ 26.  On the morning

of May 8, 2009, Nurse Badger[5] came to Plaintiff's cell in the morning and explained that his Ultram

Prescription had been discontinued.  Plaintiff told Nurse Badger that if he did not receive a dose of

Ultram he would begin to go through withdrawal; Nurse Badger agreed to speak with Defendant

Johnson regarding the situation.  Compl. at ¶¶ 27–28.

Plaintiff also submitted a sick call request on May 8, 2009, claiming that he was still in pain

due to his shoulder, but making no mention of withdrawal symptoms.  *Id.* at ¶ 28; Dkt. No. 1-1, Pl.'s

Exs. to Compl. (hereinafter "Pl.'s Exs."), at p. 13.[6]  Additionally, Plaintiff wrote a letter to Nurse

Practitioner Lashway, in which he noted that his Ultram had been taken away and requested that it

be reinstated; the letter did not mention withdrawal.  Compl. at ¶ 29; Pl.'s Exs. at pp 14–15.  On the

morning of May 9, Nurse Badger told Plaintiff that she had spoken to Defendant Johnson about "his

situation," but that she would not be reinstating his Ultram and any concerns about medication

should be made to Plaintiffs PCP; withdrawal was not mentioned.  Compl. at ¶ 31.

On May 9, 2009, Plaintiff submitted another sick call request, which stated "Need to see FNP

Ms. Lashway – Provider – To address Shoulder and Knee Issues."  Compl. at ¶ 31; Pl.'s Exs. at p.

17.  Plaintiff submitted an additional request on May 11, 2009, which stated: "Need to see FNP Ms.

Lashway – Provider — cannot move due to pain in [sic] pressure on area with tear."  Compl. at ¶

---

[5] Nurse Badger is not a Defendant in this action.

[6] Although Plaintiff provided a detailed index of the Exhibits attached to his Complaint, he failed to label each individual Exhibit.  Therefore, the Court refers to the page numbers automatically assigned by the Court's Case Management Electronic Case Filing system

32; Pl.'s Exs. at p. 18.  Neither request mentioned withdrawal symptoms.  Plaintiff alleges that Defendant Lashway wrote to Plaintiff on May 12 that his Ultram had been discontinued due to the fact that the drug was not medically necessary two months post-surgery, and because he had been caught hoarding the medication.  Compl. at ¶ 33; Pl.'s Exs. at p. 19.   Contrariwise, Defendant claims that she actually met with Plaintiff on May 12.  Lashway Decl. at ¶ 34.[7]  Defendant Lashway noted in Plaintiff's medical record that Plaintiff was two months post-surgery, had no future need for Ultram and had been caught hoarding the drug on May 5.  She prescribed Motrin as needed for seven days.  Lashway Decl. at ¶ 34; CCF Med. R. at p. 85.

On May 13, 2009, Plaintiff wrote a letter to Nurse Administrator B. Lecuyer[8] expressing his desire to reinstate his Ultram prescription.  The letter mentions that Plaintiff was experiencing pain and discomfort, trouble sleeping, and that he was not weaned off of Ultram.  Plaintiff also explained that his knee problem had not been addressed by anyone, and taking ibuprofen caused him to experience side effects, including "rapid heart beat, dizziness, [and] burning in [his] stomach, to name a few."  Compl. at ¶ 37; Pl.'s Exs. at pp. 21–22.  On May 14, Plaintiff filed a grievance, which noted that his Ultram prescription had been discontinued but does not mention that he was suffering from symptoms of withdrawal.  Compl. at ¶ 38; Pl.'s Exs. at pp. 23–24.

On May 15, 2009, Plaintiff received a response from Nurse Administrator B. Lecuyer noting that his medical records revealed his Ultram prescription was discontinued due to the fact that he was caught "cheeking" his pill.  Compl. at ¶ 39; Pl.'s Exs. at p. 25.  Plaintiff also received a note from Defendant Lashway on May 15, noting that she had advised him on May 12 that his Ultram

---

[7] Regardless of whether a visit occurred, neither party contends that Plaintiff complained of symptoms of withdrawal on May 12. *See* Compl. at ¶ 33; Lashway Decl. at ¶ 34; CCF Med. R. at p. 85.

[8] B. Lecuyer is not a Defendant in this action.

prescription had been discontinued, and that the Motrin she prescribed would be effective for his knee pain. Compl. at ¶ 39; Pl.'s Exs. at p. 26.

On May 16, 2009, Plaintiff wrote a letter to a friend, Shireen Dunlop, asking her to intervene on his behalf by writing letters to "the head dept." and Dr. Lester Wright,[9] "the director of health services, central office." Compl. at ¶ 43; Pl.'s Exs. at pp. 28–29. Although Plaintiff relayed to Dunlop that he was in constant pain and experiencing side effects from the new medication, he failed to mention withdrawal at all. *Id.* On May 20, Mrs. Dunlop, wrote to Superintendent of CCF, Dale Artus,[10] and Dr. Wright, noting that Plaintiff should not have been taken off of his medication "abruptly . . . due to the withdrawals." Compl. at ¶ 47; Pl.'s Exs. at p. 34; Pl.'s Exs. at pp. 85–89, Shireen M. Dunlop Aff., dated April 19, 2012, at ¶ 10. There is no evidence to suggest that this letter was ever seen by Defendants.

On May 18, 2009, Plaintiff submitted a sick call request, noting that his "meds" were discontinued on May 7, that he was experiencing difficulty sleeping, pain in his right knee and shoulder, and that he could not take the medicine that was provided due to side effects. Compl. at ¶ 44; Pl.'s Exs. at p. 30. This request did not mention symptoms of withdrawal. That same day, Plaintiff wrote to Superintendent Artus complaining about being taken off of his Ultram medication abruptly, the side effects he was experiencing from the Motrin and ibuprofen, the pain in his shoulder, and his inability to participate in PT; however, Plaintiff failed to mention any symptoms of withdrawal. Compl. at ¶ 45; CCF Med. R. at pp. 74–75. On May 19, Plaintiff's letter to the

---

[9] Dr. Wright is not a Defendant in this action.

[10] Superintendent Artus is not a Defendant in this action.

Superintendent was forwarded to First Deputy Superintendent Thomas LaValley,[11] for his review and action. Compl. at ¶ 46; CCF Med. R. at p. 73.

On May 22, 2009, Defendant Johnson responded to the letter Plaintiff wrote to Superintendent Artus, noting:

> You were found to be misusing/abusing your prescribed medication, to which you admit. It was your provider's decision to discontinue that medicine because she is not obligated nor comfortable continuing to prescribe medication for you to misuse or abuse. If the ibuprofen is upsetting your stomach, you can try taking it with an acid reducer. You can discuss this with Ms. Lashway when you see her – you have been scheduled to see her next week. Until then I have prescribed acetaminophen for you to use . . . for pain.

Compl. at ¶ 49; CCF Med. R. at pp. 72 & 78 (noting that T. LaValley forwarded Plaintiff's letter to Defendant Johnson).

Although Plaintiff reported to PT for his shoulder on April 30 and May 13, 2009, he refused to participate on May 15, 20, and 22. CCF Med. R. at pp. 58–62; Compl. at ¶¶ 19 & 42; Lashway Decl. at ¶ 37. On May 22, Plaintiff's physical therapist recommended that Plaintiff's PT be discontinued due to his consistent refusal to attend. Lashway Decl. at ¶ 37; CCF Med. R. at p. 58. Plaintiff's PT was discontinued on May 26. Lashway Decl. at ¶ 38; CCF Med. R. at p. 57. On May 27, Plaintiff requested an appointment with a specialist regarding his left shoulder. Compl. at ¶ 50; Pl.'s Exs. at p. 36.

On May 28, 2009, Defendant Lashway saw Plaintiff. Defendant Lashway explained that Plaintiff was discharged from PT by the provider. Defendant Lashway further advised Plaintiff that she was aware of the results of the MRI on his right knee, and that Motrin was adequate for pain control. Plaintiff requested that his Ultram prescription be reinstated, and told Defendant Lashway that he could not take either Motrin or Tylenol. When Defendant Lashway asked why Plaintiff

---

[11] Deputy Superintendent LaValley is not a Defendant in this action.

could not take either drug Plaintiff responded "you know, I just can't, I don't need to tell you." Lashway Decl. at ¶ 39; CCF Med. R. at p. 83.   Contrariwise, Plaintiff argues that at this appointment he reminded Defendant Lashway of all the drugs she had prescribed in the past and his history of issues with those drugs. Compl. at ¶ 51.   Nonetheless, it is uncontested that after this appointment, Defendant Lashway requested an orthopedic consultation for Plaintiff's right knee. Lashway Decl. at ¶ 39; Compl. at ¶ 51.

On May 28, 2009, after meeting with Defendant Lashway, Plaintiff wrote to Nurse Administrator B. Lecuyer, noting that he attempted to speak to Defendant Lashway about his shoulder but was informed that due to his failure to participate in PT his concerns with his shoulder would not be addressed, and Defendant Lashway would only address Plaintiff's concerns regarding his knee. Additionally, Plaintiff informed B. Lecuyer that "[he] was discontinued on all [his] pain medications by FNP Lashway without acknowledging any protocol procedures in weaning a person off the medication [he] was taking for more than 2yrs continuously [sic], thus [he] had to endure the suffering of withdraw[al.]" Compl. at ¶ 52; Pl.'s Exs. at pp. 38–39. That same day Plaintiff also wrote to Lester Wright, reiterating his concerns regarding his shoulder, his issues with taking Motrin and ibuprofen, and  – without describing them – noting that after his Ultram was discontinued, he suffered "serious" symptoms of withdrawal. Compl. at ¶ 53; Pl.'s Exs. at pp. 40–42.

On May 29, 2009, Plaintiff requested an additional appointment with Defendant Lashway regarding his shoulder pain. Compl. at ¶ 55; Pl.'s Exs. at p. 43.   On June 1, Nurse Administrator B. Lecuyer responded to Plaintiff's May 28 letter, noting that Nurse Lashway had already submitted a consultation request for a visit with an outside specialist. Compl. at ¶ 56; Pl.'s Exs. at p. 44. Plaintiff maintains that this referral was for treatment of his knee injury only. Compl. at ¶ 56.

On June 2, Plaintiff submitted a grievance complaining that his shoulder issues were being ignored. Compl. at ¶ 57; Pl.'s Exs. at p. 45. That same day, Plaintiff requested an appointment with a specialist. Compl. at ¶ 58; Pl.'s Exs. at p. 46. On June 8, Plaintiff submitted a sick call request noting that he required attention for his shoulder and that he had not received any medication except for twelve to fourteen Tylenol per day. Compl. at ¶ 60; Pl.'s Exs. at p. 48; Lashway Decl. at ¶ 40; CCF Med. R. at pp. 81–82.

On June 11, the Inmate Grievance Resolution Committee ("IGRC") denied Plaintiff's May 14 and June 2, 2009 grievances, noting that his medication had been discontinued due to misuse, and that Plaintiff had been seen by an orthopedic specialist who recommended PT, but that PT was discontinued due to Plaintiff's repeated refusals to attend. Compl. at ¶ 61; Pl.'s Exs. at pp. 49–50. On June 18, Plaintiff complained of his inability to receive care for his shoulder to Thomas LaValley. Compl. at ¶ 64. On June 19, the Superintendent's Office upheld the IGRC's findings with regard to Plaintiff's grievances, noting that Plaintiff had been seen for his left shoulder injury, had been prescribed PT, which was ultimately discontinued due to his failure to participate, and that he had been prescribed Motrin and Tylenol for pain management. Compl. at ¶ 65; Pl.'s Exs. at pp. 54–55.

On June 19, Plaintiff wrote to Nurse Administrator B. Lecuyer asking for additional care for his shoulder, and noting that "I have only [T]ylenol, which I have to take 10-12 for a couple hr. [sic] relief." Compl. at ¶ 67; Pl.'s Exs. at p. 57. On June 23, 2009, Nurse Administrator B. Lecuyer responded to Plaintiff's June 19 letter, noting that the nurse practitioner had advised that he had been prescribed PT, but that it was discontinued due to his own non-compliance. Compl. at ¶ 68; Pl.'s Exs. at p. 58.

On June 25, 2009, Plaintiff received a letter from Superintendent Artus informing him that the Superintendent had spoken to Defendant Johnson regarding his medication issues, and that Defendant Johnson assured him that after his upcoming orthopedic appointment, his need for PT and medication would be evaluated. Compl. at ¶ 70; Pl.'s Exs. at p. 60. On June 26, Defendant Johnson wrote to Plaintiff and informed him that "I believe Ms. Lashway has spoken to you recently re: plans to address your orthopedic issue. You will be seeing the orthopedist very soon and we will devise a plan from that point." Johnson Decl. at ¶ 15; CCF Med. R. at p. 71; Compl. at ¶ 71.

On July 3, 2009, Plaintiff was seen by Defendant Berard, who evaluated his right knee and recommended surgery, but refused to examine Plaintiff's shoulder. Compl. at ¶ 72; Pl.'s Exs. at p. 62; CCF Med. R. at pp. 40–42. On July 13, Plaintiff filed a grievance complaining that he had been told by Corrections Officer Martin[12] that he would be seen by his provider on June 9, but that call-outs were cancelled due to an emergency, and that he was told he would be seen on July 13, but that no one came to get him. Compl. at ¶ 74; Pl.'s Exs. at p. 64. On July 29, Plaintiff was informed that "a call out with the Physical therapist to address shoulder issues has been scheduled in the near future. On 7/21/09 the Facility Nurse Practitioner ordered Tylenol medication to help the discomfort. A callout with the facility Nurse Practitioner to address the shoulder issue is scheduled in the very near future." Compl. at ¶ 76; Pl.'s Exs. at p. 67.

On July 21, 2009, Defendant Lashway submitted a new request for PT for Plaintiff's left shoulder. Lashway Decl. at ¶ 41; CCF Med. R. at pp. 55–56. Under the section entitled "REASON FOR CONSULTATION," Defendant Lashway noted that "IN PAST HE REFUSED [PHYSICAL THERAPY] SERVICES . . . HE HAS SINCE AGREED TO ATTEND PHYSICAL THERAPY

_____

[12] Officer Martin is not a Defendant in this action.

SERVICES AND FOLLOW THEIR RECOMMENDATIONS." CCF Med. R. at p. 54. On July 30, 2009, Plaintiff met with a physical therapist, regarding his left shoulder, who recommended that Plaintiff undergo PT twice a week for six weeks. *Id.* Plaintiff received PT for his left shoulder on August 11, 14, 18, and 21. *Id*. at pp. 47 & 49–51; Lashway Decl. at ¶ 42.

On August 25, 2009, Dr. Berard performed surgery on Plaintiff's right knee. In his discharge instructions, Defendant Berard recommended that Plaintiff be given Tylenol #3 post-operation for pain. Berard Decl. at ¶ 17; AHMC Med. R. at pp. 000044–47. Plaintiff received Tylenol #3 every four hours, the day after the surgery. Thereafter, Plaintiff was provided with a thirty-day supply of ibuprofen for pain management.[13] Compl. at ¶¶ 81–84. On August 26, 2009, Plaintiff was referred for PT on his right knee. CCF Med. R. at p.48. Thereafter, Plaintiff received PT on his left shoulder and/or right knee on September 1, 3, 8, 11, 15, 22, 24, and October 1, 2009. *Id.* at pp. 23–25, 27–30, 34, & 38; Lashway Decl. at ¶ 42. On October 8, all of Plaintiff's PT was discontinued by his therapist. Lashway Decl. at 44; CCF Med. R. at p. 22.

On January 7, 2010, Defendant Lashway referred Plaintiff for an orthopedic consultation for his left shoulder and an MRI for his right knee based on his complaints that he had fallen and re-injured his knee. Lashway Decl. at ¶ 46; CCF Med. R. at p. 21. On February 9, 2010, Plaintiff was referred for PT on his right knee. CCF Med. R. at p. 20. On February 18 and March 4, Plaintiff refused to participate in PT for his right knee. *Id.* at pp. 18–19. Nonetheless, Plaintiff was provided PT for his right knee on March 25. *Id.* at p. 16. On March 22, Plaintiff's physical therapist noted that Plaintiff had no new complaints, and that he was making "slow progress" and should continue PT twice a week. Pl.'s Exs. at p. 82. Per Defendant Lashway's January 7 consultation request,

---

[13] It is unclear who prescribed Plaintiff ibuprofen after his surgery.

Defendant Berard met with Plaintiff regarding his left shoulder on March 26. Defendant Berard found no remaining instability in Plaintiff's shoulder and recommended that he receive PT twice a week for one more month and continue PT on his own thereafter. *Id.* at pp. 17 & 78; Berard Decl. at ¶ 18.

Plaintiff received PT on his right knee on April 6, 2010. CCF Med. R. at pp. 15. On April 9, 13, and 16, Plaintiff refused to participate in PT sessions for his left shoulder, prompting Plaintiff's physical therapist to request that his PT be discontinued on April 16. *Id.* at pp. 12–14.[14] On May 19, 2010, Plaintiff was transferred from CCF to Shawangunk Correctional Facility. *Id.* at p. 76; Compl. at ¶ 96.

## B. Deliberate Medical Indifference

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.'" *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994).

The seriousness element is an objective test, to determine whether the deprivation of care

---

[14] Defendants claim that Plaintiff refused PT for his knee on April 9, 13, & 16, 2010. However, it is not readily apparent from the documents cited by Defendants that these therapy sessions were for anything other than Plaintiff's left shoulder. *See* Pl.'s 7.1 Statement at ¶¶ 66–67 & 69–70; *see also* CCF Med. R. at pp. 12–14.

is sufficiently serious "entails two inquiries." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citations omitted). First, courts must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is "adequate" where the care provided is a "reasonable" response in light of the "health risk" the inmate faces. *Id.* at pp. 279–80. The second inquiry requires a determination of "whether the inadequacy in medical care is sufficiently serious." *Id.* at p. 280. In cases where medical care is denied, courts focus on the seriousness of the underlying medical condition. *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003). Some of the factors that determine whether a prisoner's medical condition is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical condition significantly affects daily activities, and 3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is at the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one").

Whereas, the "seriousness inquiry is narrower" in cases where "the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment." *Salahuddin v. Goord*, 467 F.3d at 280 (citing *Smith v. Carpenter*, 316 F.3d at 185)). In such cases, courts "focus[] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.* The question becomes whether delaying treatment subjected Plaintiff to any serious risk of harm. To that end, the Second Circuit has instructed us that "the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Smith v. Carpenter*, 316 F.3d at 187. In this regard, "the

actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* Determining whether the inadequacy/delay presents a sufficiently serious risk "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* (citing *Helling, v. McKinney*, 509 U.S. 25, 32–33 (1993)).

The second element, deliberate indifference, is based on a subjective standard. To establish deliberate indifference a plaintiff must demonstrate that the defendant acted with a culpable mental state, similar to criminal recklessness. *Wilson v. Seiter*, 501 U.S. 294, 301-03 (1991); *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer*). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted). Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, such a classification is reserved "for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast degenerating condition for three days; or delayed major surgery for over two

-17-

years." *Freeman v. Stack*, 2000 WL 1459782, at *6 (S.D.N.Y. Sep. 29, 2000).

Construed liberally, Plaintiff's Complaint alleges that Defendants provided constitutionally inadequate care for his shoulder, knee, and withdrawal symptoms.

### 1. *Denial of Care*

#### a. Withdrawal

Plaintiff alleges that Defendants Lashway and Johnson denied him treatment for the symptoms of withdrawal that he experienced after his Ultram medication was discontinued by Defendant Lashway on May 7, 2009. *See* Compl. at ¶¶ 26, 28, & 102–103. According to Plaintiff, for a week and a half to two weeks after the Ultram was discontinued he suffered from withdrawal symptoms, which included: stomach cramps, diarrhea, lack of sleep, aches all over his body, and a migraine headache that would not go away. Compl. at ¶ 35. However, as explained below, even if we accept, *arguendo*, that these injuries were sufficiently serious for purposes of the Eighth Amendment, there is no evidence to suggest that Defendants Lashway and Johnson were aware of Plaintiff's withdrawal symptoms until after they subsided.

As noted above, Plaintiff's Ultram medication was discontinued by Defendant Lashway on May 7, 2009, based on her belief that Plaintiff had been misusing/abusing the drug, and her medical belief that Ultram was no longer necessary to treat Plaintiff's pain two months after his surgery. On May 8, upon being notified that his Ultram prescription had been discontinued, Plaintiff informed Nurse Badger that he would begin to suffer from withdrawal if he did not get his pills; Nurse Badger agreed to speak with Defendant Johnson about Plaintiff's Ultram prescription. Compl. at ¶¶ 26–28. It is unclear whether Defendant Badger actually mentioned Plaintiff's fear of impending withdrawal to Defendant Johnson. However, even if Nurse Badger had told Defendant Johnson that Plaintiff

believed he would start to experience symptoms of withdrawal if he did not receive more Ultram, Defendant Johnson cannot be found to have been deliberately indifferent toward a purely speculative condition. *See Alston v. Bendheim*, 672 F. Supp. 2d 378, 386 (S.D.N.Y. 2009). Even where the doctor allegedly knows that the medication contains addictive attributes and that the patient has been taking it for an extended period of time, the failure by the doctor to predict the patient's addiction and withdrawal amounts to nothing more than negligence or malpractice; tortious conduct which is not actionable under § 1983. *Id.*

Moreover, although Plaintiff and Mrs. Dunlop wrote numerous letters and made multiple sick call requests between May 7 and May 21, 2009, these letters and requests either did not mention withdrawal or Plaintiff's symptoms, or, in the case of the letter written on Plaintiff's behalf by Mrs. Dunlop, were not addressed to Defendants. CCF Med. R. at pp. 74–75; Pl.'s Exs. at pp. 13–15, 17–18, 21–24, 28–30, 34, & 36. At the earliest, Defendants Johnson and Lashway received notice that Plaintiff was suffering severe symptoms of withdrawal on May 28, 2009. On that day, Plaintiff alleges that he met with Defendant Lashway and discussed his medication issues with her; furthermore, the record reflects that he also sent letters to Lester Wright and Nurse Administrator B. Lecuyer in which he mentioned that he had been forced to suffer "severe" symptoms of withdrawal. Lashway Decl. at ¶ 39; CCF Med. R. at p. 83; Compl. at ¶¶ 52–53; Pl.'s Exs. at pp. 38–39 & 40–42.

Crucially, by his own admission, Plaintiff's withdrawal symptoms only lasted between a week and a half and two weeks, and therefore, would have already subsided by May 28, 2009. Compl. at ¶ 35. Thus, it cannot be established that either Defendant Lashway or Johnson knew of, let alone consciously disregarded, Plaintiff's severe symptoms of withdrawal. *See Hathaway v.*

*Coughlin,* 37 F.3d at 66 (to establish deliberate indifference, the defendant must "know[ ] of and disregard [ ] an excessive risk to inmate health or safety").

Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims that Defendants Johnson and Lashway denied him treatment for his symptoms of withdrawal.

### b. Shoulder

Plaintiff's shoulder injury caused him to suffer from severe pain on a daily basis and interfered with his ability to use his left arm. Moreover, as noted above, Plaintiff's shoulder injury was sufficiently serious enough to warrant, *inter alia*, an MRI and x-ray, visits with specialists, PT, pain killers, and multiple surgeries. *See supra* Part II. A. Thus, Plaintiff has established that his shoulder injury is an objectively serious medical condition for purposes of the Eighth Amendment. *See Chance v. Armstrong*, 143 F.3d at 702.

Yet, as noted above, Defendants provided or recommended a host of treatments including: consultations with outside specialists, x-rays, MRIs, PT, three surgeries, and pain medications such as cortisone shots, Tylenol, Celebrex, Motrin, Ultram, and Tylenol #3, *see supra* Part II.A. Documented evidence of such extensive, frequent, and appropriate treatments are in and of themselves sufficient to dispel any notion that these Defendants outright denied Plaintiff adequate medical care for the treatment of his shoulder. *Cf. Buffaloe v. Fein*, 2013 WL 5815371, *8 (S.D.N.Y. Oct. 24, 2013) (collecting cases in support of the proposition that "the high frequency of care could reasonably have assured Dr. Bernstein that there was no denial or delay of care"); *see also Harrington v. Mid-State Corr. Facility*, 2010 WL 3522520 (N.D.N.Y. May 21, 2010) (finding that defendant doctors' "actions of referring [plaintiff's] care to a specialist, more familiar with the

intricacies of [plaintiff's] subjective symptoms, belies any claims of deliberate indifference. Referring for specialist care, explaining the specialist's findings, and referring for further diagnostic follow-up are all appropriate treatment actions.") (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)).

Nonetheless, Plaintiff alleges that he was denied medical care for his shoulder: (i) by Defendants Johnson,[15] Lashway, and Berard for their failure to administer proper pain medication to Plaintiff; and (ii) when Defendant Berard refused to look at Plaintiff's left shoulder during a consultative examination of his right knee on July 3, 2009.

### i. Pain Medication

Plaintiff's claims that he was denied adequate treatment for his knee and shoulder injuries because each of the Defendants failed to provide him with proper pain medication are unavailing. *See* Compl. at ¶¶ 102–106. Neither Defendant Lashway's decision to discontinue Plaintiff's Ultram prescription on May 7, 2009, nor her or Defendant Johnson's subsequent refusals to reinstate his Ultram prescription, constituted deliberate indifference. *See Wright v. Genovese,* 694 F. Supp. 2d 137, 160 (N.D.N.Y.2010) ("Differences in opinion between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's serious medical needs."). This is particularly true in the instant case where Defendants' decisions were supported by Defendant Lashway's medical judgment that Ultram was no longer medically necessary two months post-surgery, and the fact that Plaintiff had twice

---

[15] In addition to allegations that can plausibly be interpreted as alleging that Defendant Johnson was liable for the care she personally provided to Plaintiff, Plaintiff has also alleged that Defendant Johnson was liable in her supervisory capacity for violations, of which she was allegedly aware, committed by Defendants Lashway and/or Berard. *Compare* Compl. at ¶ 105, *with id.* at ¶ 114. We deal first with Plaintiff's direct allegations against Defendant Johnson, and consider his supervisory claims against her last. *See infra* at Part II.D.

been disciplined for misusing the medication. *See, e.g.*, Lashway Decl. at ¶¶ 32 &34; CCF Med. R. at pp. 72 & 87; Pl.'s Exs. at pp. 19, 25, 49, and 69; *see also Josey v. Rock*, 2013 WL 1500435, at *9 (N.D.N.Y. Mar. 19, 2013) (finding no deliberate indifference where doctors discontinued Ultram prescription based on their concerns that plaintiff was seeking Ultram for non-medical reasons and Ultram was not the best treatment for patient's pain); *see also Cole v. Pang Lay Kooi*, 2013 WL 4026842, at *5 (N.D.N.Y. Aug. 6, 2013) (finding a lack of deliberate indifference where prisoner's Ultram prescription was discontinued after he was caught hoarding doses of the drug); *Scott v. Perio*, 2005 WL 711884, at *6 (W.D.N.Y. Mar. 25, 2005) (finding that in the absence of evidence that stronger medication was withheld for non-medical reasons, "[i]t is not for the Court to second guess plaintiff's medical providers as to what medicine or what dosage should have been prescribed to treat the plaintiff.").

Likewise, Plaintiff's claim that Defendant Lashway was deliberately indifferent because she refused to prescribe any pain medication other than NSAID pain relievers, which she allegedly knew he could not tolerate, is patently untrue. Countless entries in the record establish that Plaintiff was continuously provided with Tylenol, a non-NSAID pain medication, that he had tolerated in the past and admits provided him some relief with regard to his present claims. *See, e.g.,* Lashway Decl. at ¶ 21; CCF Med. R. at pp. 53, 72, & 93; Pl.'s Exs. at pp. 48, 50, 55, 57, & 67. Thus, Plaintiff had access to pain medication other than NSAIDs.[16]

Moreover, even if Defendants Lashway and/or Johnson had decided to prescribe Motrin or

---

[16] Moreover, to the extent that Plaintiff claims Defendant Johnson was deliberately indifferent to his intolerance for NSAIDs, such a claim is unsupported by the record. *See* Compl. at ¶ 105. Indeed, when Defendant Johnson learned about Plaintiff's inability to tolerate the drug *via* his May 18 letter to Superintendent Artus, she advised him to try taking the medication with an acid reducer and prescribed Tylenol as well. Compl. at ¶ 49; CCF Med. R. at p. 72.

some other NSAID, the decision to choose one form of pain medication over another, even if the medication causes side effects, is not indicative of deliberate indifference. *See Rush v. Fischer*, 2011 WL 6747392, at *3 (S.D.N.Y. Dec. 23, 2011) ("The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs.") (citing*, inter alia*, *Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir. 2011), & *Reyes v. Gardener,* 93 F. App'x 283, 285 (2d Cir. 2004) (summary order)); *Perez v. Cnty. of Monroe*, 945 F. Supp. 2d 413, 415 (W.D.N.Y. 2013) (finding that, "at most" plaintiff's allegation that the medicine prescribed by his doctor caused joint pain and arthritis as side effects was a "'mere disagreement over [his] proper treatment,' which does not give rise to a constitutional violation") (quoting and citing *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998)); *see also Idowu v. Middleton*, 2012 WL 6040742, at *6 (S.D.N.Y. Dec. 4, 2012) (finding no Eighth Amendment claim stated where nurse ignored plaintiff's complaints, on three separate occasions, that he was experiencing side effects from the medication he was prescribed which included: "stomach pains, vomiting, dizziness, insomnia and other conditions").[17]

Furthermore, with respect to Plaintiff's allegations that Defendant Berard failed to provide adequate pain medication, *see* Compl. at ¶ 106, it is clear from the medical records that after each of Plaintiff's surgeries Defendant Berard provided pain medication to Plaintiff while he remained within the Defendant's care at AHMC. Berard Decl. at ¶¶ 12, 14, & 17; AHMC Med. R. at pp. 000031–34, 000034–38, & 000044–46. Additionally, it is undisputed that Defendant Berard was not Defendant Lashway's nor Defendant Johnson's supervisor, nor possessed the authority to

___
[17] Furthermore, Plaintiff's failure to abide by Defendants' instructions, including their instructions to take Motrin and ibuprofen further belie his claims. *See Snyder v. Law*, 2010 WL 5572768, at *3 (concluding that plaintiff's failure to take the medication prescribed by his doctors – regardless of the fact that the drugs allegedly caused side effects – was fatal to his deliberate medical indifference claim).

prescribe pain medication to Plaintiff once he left AHMC and returned to CCF.  Berard Decl. at ¶ 8, 7, & 19; *also cf.* Compl. at ¶ 72.

## ii.  July 3, 2009

Plaintiff maintains that he went to see Defendant Berard on July 3, 2009, for treatment of his right knee.  At that appointment Plaintiff also requested that Defendant Berard examine his left shoulder.  "Defendant Dr. Berard advised Plaintiff he was there to be seen about whether or not he would like to have his R-knee surgically repaired – he had not been told by anyone that he was supposed to examine Plaintiff's L-shoulder, and he said there was nothing written in the file he had for the consult."  Compl. at ¶ 72.  Dr. Berard's refusal to examine Plaintiff's left shoulder because it was outside of the scope of what care he was authorized to provide does not evince deliberate indifference.[18]  Indeed, Plaintiff had been told prior to his July 3 appointment that his shoulder issues would be dealt with after his July 3 appointment for his knee issue.  *See* Compl. at ¶¶ 70 –71; Pl.'s Exs. at p. 60; CCF Med. R. at p. 71.

Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims that he was ever denied care for his left shoulder.

---

[18]  However, even if Defendant Berard's alleged refusal to provide Plaintiff with treatment for his shoulder on July 3, 2009 did constitute deliberate indifference, Plaintiff is barred by the statute of limitations from bringing an action against Defendant Berard based on this incident.  In a § 1983 action, the applicable statute of limitations is the "general or residual statute for personal injury actions," of the state in which the federal court is located.  *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)) (alterations omitted).

In New York, a three-year statute of limitations applies for personal injury actions, and thus to § 1983 actions as well.  *Id.*; *see also* N.Y.C.P.L.R. § 214(5).  "While state law supplies the statute of limitations for claims under § 1983, federal law determines when a federal claim accrues.  The claim accrues when the plaintiff knows or has reason to know of the harm."  *Connolly v. McCall*, 254 F.3d 36, 41 (2d Cir. 2001) (citation omitted).

Plaintiff signed his Complaint in the instant action on July 26, 2012.  *See* Compl.  Thus, Plaintiff is barred from raising any claim against Defendant Berard which he knew or should have known of prior to July 26, 2009.  Moreover, and notwithstanding Plaintiff's argument to the contrary, Defendants properly preserved the statute of limitations as an affirmative defense by timely raising it in their Answer.  *See* Dkt. No. 15, Answer, at ¶ 15; *see also* Pl.'s Opp'n at pp. 13–14. Defendants did not raise the statute of limitations with regard to any of Plaintiff's other claims.

## 2. Delay in Care

At best, affording Plaintiff all of the special solicitude and liberality owed to a *pro se* Plaintiff, Plaintiff's remaining allegations are best interpreted as claims that care for his knee and shoulder was unconstitutionally delayed. Specifically, Plaintiff has alleged that: (i) his requests for sick call were not always timely followed; (ii) between May 26 and July 21, 2009, Defendant Lashway discontinued PT on his shoulder, refused his requests for an appointment with a specialist, and provided only pain medication for his shoulder injury; and (iii) that he was provided only pain medication for treatment of his right knee between March 22, 2009, when the injury was discovered, and August 25, 2009, when Dr. Berard performed surgery on his knee. *See generally* Compl.

### a. Sick Call

According to Plaintiff, despite submitting sick call requests on May 8, 9, and 11, 2009, "on the callouts for May 14, 2009 he was not seen when Defendant FNP Lashway came to the SHU, nor did she make a round, as was normal protocol;" furthermore despite submitting a sick call request on May 18, Plaintiff was not seen until May 28, 2009. Compl. at ¶ 57. Plaintiff also alleges that "on July 13, 2009, Plaintiff was supposed to be seen by his provider, but he was not seen at that time[.]" *Id.* at ¶ 74.

Typically, delays that constitute deliberate indifference occur when "'officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.'" *Washington v. Farooki*, 2013 WL 3328240, at *6 (N.D.N.Y. July 2, 2013) (quoting *Brunskill v. Cnty. of Suffolk,* 2012 WL 2921180, at *3 (E.D.N.Y. July 11, 2012)). As noted above, Plaintiff's shoulder injury was an objectively sufficiently serious injury. Contrariwise, with respect to Plaintiff's knee injury, courts within our

Circuit have repeatedly held that a torn medial meniscus is not an objectively sufficiently serious condition for purposes of the Eight Amendment. *See Moody v. Pickles*, 2006 WL 2645124, at *6 (N.D.N.Y. Sept. 13, 2006) (surveying cases). However, even if both conditions constituted serious injuries, there is no evidence in the record before us to suggest that either injury was life threatening or fast degenerating, or that these appointments were deliberately delayed as a form of punishment. Moreover, it is clear from our discussion of the facts above that Plaintiff received near constant care from Defendant Lashway during the several month period surrounding these incidents including, *inter alia*, pain medication, PT, appointments with specialists, and multiple surgeries. *See supra*, Part II.A.

Accordingly, we recommend that Defendants' Motion be **GRANTED** to the extent that Plaintiff alleges that a handful of missed appointments during a period in which he received near continuous care constituted an unconstitutional delay in treatment. *See Morrison v. Mamis*, 2008 WL 5451639, at *9  nn. 8 & 23 (S.D.N.Y. Dec. 18, 2008) (surveying cases in support of a similar conclusion).

b.  Delay in Shoulder Treatment

Plaintiff alleges that, after his physical therapist recommended that his PT for his left-shoulder be discontinued based on his consistent refusals to attend, Defendants Lashway and Johnson refused to permit him to see a specialist for his shoulder until and unless he completed the twelve sessions of PT which they had prescribed. *See, e.g.,* Pl.'s Opp'n at pp. 9–10 ("Prior to May 2009, Plaintiff had not been refused any requests by Defendants Lashway or Berard, and Johnson, too, on the one time she seen [sic] me after a surgery.  After May 2009, Plaintiff could not get anything for his [shoulder] except the 12 [physical therapy] sessions Defendant Lashway and

Johnson told Plaintiff he had to go to in order to receive any further treatment for his shoulder."); *see also* Compl. at ¶ 114 ("Defendants FNP Lashway and Dr. Johnson . . . refused to see [him], and no longer would make available adequate treatment for [his] ongoing l-shoulder by discontinuing requests for followup care, then telling [him] that once he took Pt sessions, and seen the orthopedic Doctor, he would be considered for treatment and pain medication.").

Ironically, it was due to Plaintiff's own reluctance to accept a third surgery on April 10, 2009, that Plaintiff was prescribed the twelve PT sessions in the first place. Indeed, Plaintiff declined a third shoulder surgery and elected instead to continue with PT, noting that "he became hesitant because his shoulder seemed more of an experiment, than actual remedies to fix his problem." Compl. at ¶ 17. Accordingly, Dr. Macelaru recommended that Plaintiff undergo two months of PT and then be re-evaluated. Berard Decl. at ¶ 15; CCF Med. R. at p. 62. And, although Plaintiff initially reported for PT on April 30 and May 13, 2009, he failed to report on May 15, 20, and 22, at which time his therapist requested that PT be discontinued. CCF Med. R. at pp. 57–60 & 62. During the so called period of delay, Defendants Lashway and Johnson, as well as other prison officials repeatedly explained to Plaintiff that treatment for his left shoulder was denied during this period because of his own refusal to participate in the PT that had been prescribed for him. CCF Med. R. at pp. 57–60 & 62; Compl. at ¶¶ 61 & 68; Pl.'s Exs. at pp. 55 & 58. Crucially, the record reflects that once Plaintiff agreed to complete PT, PT was re-instated. *See* CCF Med. R. at p. 54.

Plaintiff's allegation that Defendants Lashway and Johnson refused to provide further treatment for his shoulder until he completed the two months of PT that was prescribed does not evince deliberate indifference. Rather, it reflects a reasonable response to Plaintiff's ongoing refusal

to adhere to the course of treatment that they prescribed. Stated simply, Plaintiff cannot on the one hand refuse to participate in the treatments prescribed by his doctors, and on the other claim that the course of treatment was inadequate. *See Buffaloe v. Fein*, 2013 WL 5815371, at *9 (surveying cases for the proposition that in light of plaintiff's "ongoing medication treatment and his history of refusing physical therapy and medication," defendants denial of care did not constitute deliberate indifference); *see also Snyder v. Law*, 2010 WL 5572768, at *3 (N.D.N.Y. Dec. 21, 2010) (surveying cases for the proposition that the "*fait de compli*" in plaintiff's deliberate medical indifference case was his failure to adhere to the course of treatment prescribed by his doctors). Plaintiff's desire to see an orthopedic specialist before completing the course of PT prescribed by Defendants is nothing more than an in-actionable disagreement between a prisoner and his doctors as to the appropriate form of treatment.[19] *Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (citing *Chance v. Armstrong,* 143 F.3d at 703, for the proposition that "strengthening exercises are in fact a form of medical care. Demata's mere disagreement with this form of treatment does not establish deliberate indifference.").

Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims that Defendants Lashway and Johnson unconstitutionally delayed his shoulder treatment.

### c. Delay in Knee Treatment

On March 3, 2009, Plaintiff was diagnosed with a "medial miniscus tear" in his right knee.

---

[19] The instant case does not compare to that of *Harrison v. Barkley*, 219 F.3d 132, 138 (2d Cir. 2000), where it was held "that (1) outright refusal of any treatment for a degenerative condition that tends to cause acute infection and pain if left untreated *and* (2) imposition of a seriously unreasonable condition on such treatment, both constitute deliberate indifference on the part of prison officials." Unlike that case, here Plaintiff continued to receive pain medication and was asked merely to complete a reasonable, if conservative, form of treatment prior to being evaluated for further surgery.

Lashway Decl. at ¶ 24; CCF Med. R. at p. 90. However, Plaintiff did not receive surgery until August 25, 2009. Compl. at ¶ 39; Pl.'s Exs. at p. 26. Berard Decl. at ¶ 17; AHMC Med. R. at pp. 000044–46. Additionally, it is clear that Plaintiff was receiving pain medication during the interval between his diagnosis and surgery. At the time of his diagnosis, and up until the medication was discontinued by Defendant Lashway on May 7, Plaintiff was receiving Ultram for pain. Johnson Decl. at ¶ 2 & 8; Lashway Decl. at ¶ 24; CCF Med. R. at pp. 88–89. After the Ultram was discontinued, Plaintiff was informed that the pain medications he had been prescribed, including Tylenol and Motrin were sufficient to manage his knee pain. Compl. at ¶ 39; Pl.'s Exs. at p. 26; Lashway Decl. at ¶ 39. Where such ongoing treatment is evident, it has been held that delaying surgery for the same injury for as long as a year does not amount to deliberate indifference. *See Moody v. Pickles*, 2006 WL 2645124, at *6 (N.D.N.Y. Sept. 13, 2006) (citing *Culp v. Koenigsmann*, 2000 WL 995495, at *4, *9-*10 (S.D.N.Y. July 19, 2000) for the proposition that there was no "Eighth Amendment violation where plaintiff suffered from a torn medial meniscus and experienced a one-year delay from injury to surgery")).

Accordingly, because there are no genuine issues of material fact with respect to whether Defendants Lashway, Johnson, or Berard provided Plaintiff with constitutionally adequate medical care for his knee and shoulder we recommend that Defendants' Motion for Summary Judgment be **GRANTED** with regard to all of Plaintiff's deliberate medical indifference claims.

### C. Retaliation

Plaintiff alleges that Defendants conspired with one another to deprive him of constitutionally adequate medical care in retaliation for grievances and complaints he filed regarding his medical treatment. *See* Compl. at ¶¶ 109–113.

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir. 1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d Cir. 1988). Claims of retaliation, like those asserted by Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak*, 389 F.3d 379, 381-83 (2d Cir. 2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872 (citation omitted); *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d at 492); *see also Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002).

The plaintiff bears the initial burden in showing that the defendant's actions were improperly

motivated. To satisfy the second prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995). A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003) (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia*, the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citing *Dawes v. Walker*, 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d at 493. Furthermore, in satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 492 (internal quotation marks and citations omitted) (cited in *Davis*, 320 F.3d at 353).

In situations where the defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citing, *inter alia*, *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977)); *Lowrance v. Achtyl,* 20 F.3d

529, 535 (2d Cir. 1994) (cited in *Carpio v. Walker*, 1997 WL 642543, at \*6 (N.D.N.Y. Oct. 15,1997)); *see also Gayle v. Gonyea*, 313 F.3d at 682 (defendant may successfully meet this burden of justification with regard to a particular punishment by demonstrating that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report" (internal quotation marks and citations omitted)).

There is no question that filing grievances is a protected activity. Likewise, "it is plausible that a denial of medical evaluation, treatment, and adequate pain medication would suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prison doctor." *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009); *Benitez v. Parmer*, 2013 WL 5310245, at \*8 (N.D.N.Y. July 8, 2013) (GTS/DEP) (citing *Burton v. Lynch*).

However, as noted above, here there is no evidence that Plaintiff was ever deprived of adequate medical care. *See infra* Part II.B. Indeed, between May 7, 2009 (when Plaintiff's Ultram prescription was discontinued and he began filing grievances and complaints about his treatment), and May 2010 (when Plaintiff was transferred to Shawangunk), Plaintiff received near continuous treatment, including: four visits with Defendant Lashway who made no less than six referrals for Plaintiff to see specialists, CCF Med. R. at pp. 10, 20, 64, 77–79 & 83; two visits and knee surgery with Defendant Berard, *id*. at p. 17, & AHMC Med. R. at pp. 000041–46; and, twenty-four scheduled appointments for PT for his knee and/or shoulder, CCF Med. R. at pp. 11–16, 18–19, 22–30, 34, 36, 47, 49–51, & 54. Our conclusion in this regard is, on its own, likely sufficient to grant summary judgment against Plaintiff's medical retaliation claims. *See Cole v. Levitt*, 2009 WL 4571828, at \*10 (W.D.N.Y. Dec. 4, 2009) (citing *Goros v. Pearlman,* 2007 WL 1423718, \*3 (N.D.N.Y.2007), for the proposition that no medical retaliation occurred where there was no

evidence of medical deliberate indifference); *Tatta v. Wright*, 616 F. Supp. 2d 308, 320 (N.D.N.Y. 2007) (denying plaintiff's claim that he was denied adequate medical care in retaliation for filing grievances where plaintiff failed to establish the denial of adequate medical care).

However, here additional reasons for dismissal also exist. Construed liberally, Plaintiff alleges that Defendants took the following adverse actions: (1) they discontinued and/or refused to reinstate his Ultram prescription; (2) they prescribed ineffective pain medications; (3) refused to provide him with a follow-up appointment with a specialist after he refused to participate in PT; and (4) Defendant Lashway verbally threatened him. *See* Compl. at ¶¶ 109–113.

With respect to the first three alleged adverse actions, Defendants have clearly established that they had legitimate non-retaliatory reasons for taking such actions – *i.e.*, Plaintiff's lack of medical need for and history of abusing/misusing Ultram, and his refusal to participate in PT. *See Graham v. Henderson*, 89 F.3d at 79.

Additionally, Plaintiff alleges that "almost immediately after . . . [he] filed grievances against the Defendant [Lashway,] Plaintiff was warned by the Defendant that if he continued with complaints and grievances they would only get worse for him concerning his treatment." Compl. at ¶ 109. In some cases, verbal threats have been held to constitute adverse action. *See Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) (surveying cases in support of the proposition that "some verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action"). However, Plaintiff's allegation is deficient in numerous ways. To begin with, Plaintiff does not identify when or where this allegation was made nor which grievance brought about the alleged threats. More importantly, the allegation is too non-specific and indirect to have a chilling effect on a prisoner of ordinary firmness. *See id.* (surveying cases for the

proposition that "[t]he less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights"); *Alicea v. Howell*, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) ("alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance . . . do not give rise to a First Amendment retaliation claim.").

Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's retaliation claims against Defendants. Likewise, because we have found no evidence of any constitutional violations, to the extent that Plaintiff alleges that the Defendants conspired with one another to deny him adequate medical care in retaliation for exercising his First Amendment rights, we recommend that such claim also be **DISMISSED**. *See Benitez v. Parmer*, 2013 WL 5310245, at *10 (surveying cases for the proposition that in the absence of any underlying constitutional violations, a plaintiff cannot sustain a § 1983 conspiracy claim).

### D. Supervisory Liability

To the extent that Plaintiff has argued that Defendant Johnson was liable in her supervisory capacity for the alleged underlying constitutional violations committed by Defendant Lashaway and/or Berard, we recommend that such claims be **DISMISSED** in light of the fact that we have found no evidence of any underlying constitutional violations. *See, e.g.,* Compl. at ¶ 105; *see also Elek v. Inc. Vill. of Monroe*, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because Plaintiff has not established any underlying constitutional violation, she cannot state a claim for § 1983 supervisor liability").

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 37) be **GRANTED**, and that the Complaint be **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date:   July 16, 2014
        Albany, New York

Randolph F. Treece
U.S. Magistrate Judge